**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**

**CHARLES PIPPIN**                                                      **PLAINTIFF**

**v.**                                    **Case No. 5:15-CV-05123**

**ROCK-TENN COMPANY GROUP BENEFIT PLAN**                    **DEFENDANT**

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Charles Pippin brings this action pursuant to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, alleging Defendant Rock-Tenn Company Group Benefit Plan wrongly denied his claim for short-term disability benefits.  Before the Court are the Administrative Record (Doc. 13) and applicable Group Benefit Plan (Doc. 16), Plaintiff's Brief (Doc. 14), and Defendant's Brief (Doc. 18).  For the reasons stated herein, the Court **REVERSES** the administrator's denial of benefits and **ORDERS** that Mr. Pippin's claim for short-term disability benefits be paid.

**I. BACKGROUND**

Plaintiff Charles Pippin is a 68-year old male who currently works as a Maintenance Technician for Rock-Tenn Company.  He has been employed by this company, in this same position, for the past 48 years—since 1968.  His job is classified as a "medium work-level" position that requires Mr. Pippin to be on his feet 100% of the work day, either standing or walking.  (Doc. 13-19, p. 88).  He is expected to lift, carry, push, and pull up to 50 pounds and occasionally climb, stoop, kneel, and crouch.  *Id.* at p. 89.  His job description states that his duties include dust mopping, pushing a four-wheel ink cart and

1

trash can, lifting five-gallon buckets of ink, bundling flat boxes together, and maneuvering both wood and plastic pallets for loading.  *Id.*  In order to do all of these tasks, he is expected to have "normal mobility," including the ability to maintain "independence on steps without rails," and "work in a manufacturing environment . . . around heavy machinery with rotating parts on a constant basis."  *Id.* at 91.

Mr. Pippin injured himself outside of work on February 27, 2014, when he suffered a contusion and hematoma, i.e., bruising and swelling, on his right leg, from his shin to his toes, after jumping on a trailer hitch.  He first missed work to seek medical treatment a little more than a week after the accident, on March 10, 2014, when the condition of his injury worsened.  He reported on March 10th to the Mercy Clinic in Rogers, Arkansas, and was seen by Advanced Practice Registered Nurse Kelly D. Pruett.  (Doc. 13-2).  Mr. Pippin was diagnosed with an infection and abscess at the site of the injury.  (Doc. 13-19, p. 62).  He underwent an ultrasound that day to rule out the possibility of deep vein thrombosis.  *Id.*  Nurse Pruett then wrote him a note, which she intended that Mr. Pippin present to his employer, explaining that he was not to report for work until March 12, 2014, the date of a scheduled follow-up appointment.  (Doc. 13-2).

Mr. Pippin's follow-up appointment took place at Mercy Clinic with Licensed Practical Nurse Amanda Meeker on March 12, 2014.  Following the visit, Nurse Meeker wrote a note for Mr. Pippin's employer that simply stated:  "Due to medical reasons, Charles E. Pippin may not return to work until further evaluation is done by his physician."  (Doc. 13-3).  No other doctor's notes or medical records are associated with the March 12th visit.

On March 14, 2014, the Benefit Service Center for Rock-Tenn Company Group Benefit Plan ("Rock-Tenn") received a claim filed by Mr. Pippin for short-term disability

2

benefits, related to his right-leg injury.  (Doc. 13-4, p. 1).  Rock-Tenn advised Mr. Pippin in a letter dated March 17, 2014, about his rights under the Family Medical Leave Act ("FMLA") and requested that he submit a completed Health Care Provider Certification form, which authorized Rock-Tenn's claims reviewers to speak to Mr. Pippin's doctors about his short-term disability claim.  The letter also stated that Mr. Pippin's "return-to-work date will be determined based on information we receive from your health care provider," and he "will be expected to return to work on the day, or the next scheduled work day, that [his] health care provider certifies [he is] able to return."  *Id.* at p. 2.

On March 19, 2014, Mr. Pippin was examined by Dr. David C. Garrett, who wrote a note that day directed to Mr. Pippin's employer to explain that Mr. Pippin had developed a staph infection in his leg and was to be "off work [the] rest of [the] week."  (Doc. 13-19, p. 47).  Soon after, Mr. Pippin was seen at the Mercy Wound Care Center, which provided him yet another note,[1] dated March 21, 2014, ordering Mr. Pippin to remain "off work 3-21→3-31."  *Id.* at p. 48.

Meanwhile, the Benefit Service Center for Rock-Tenn began conducting its review of Mr. Pippin's short-term disability claim.  It sent Mr. Pippin a status letter on March 24, 2014, explaining that it was unable to make a decision about the claim "due to the lack of supporting documentation."  (Doc. 13-5).  In particular, Rock-Tenn noted that its claims agents had attempted to contact Mr. Pippin's primary care physician, Dr. Garrett, on March 18th, 20th, and 21st, requesting medical records to support the claim, but no other documentation had been provided.  Rock-Tenn also contacted Mr. Pippin on March 17th

---

[1]  The physician's signature on the note is illegible.

and his wife on March 24th, informing them both that more medical paperwork was required to support the claim.  At the close of the March 24th letter, the company informed Mr. Pippin that it could not approve his claim at this time, "based on insufficient evidence to establish disability."  *Id.*

Following the initial denial of his claim, Mr. Pippin visited Dr. Garrett again on April 1, 2014.  Dr. Garrett wrote a note to Mr. Pippin's employer ordering that "[d]ue to medical reasons, Charles E. Pippin may not return to work until seen by [an] orthopedic specialist." (Doc. 13-19, p. 49).  Mr. Pippin then saw orthopedic specialist Dr. John D. Mertz on April 10, 2014, one month after he first sought treatment for his leg wound.  Chart notes from the April 10th visit indicate that Mr. Pippin still suffered from a "[r]esolving hematoma" and "[s]taph infection," with no obvious sepsis, but with minimal warmth and mild pain.  *Id.* at p. 59.  Dr. Mertz noted on the chart that Mr. Pippin had "[g]ood motion of the knee and ankle," and the CT scan taken of his injured leg was "unremarkable."  *Id.*  Despite these observations, Dr. Mertz documented that Mr. Pippin was suffering "with enough pain to keep him off work."  *Id.*  The summary report of the visit also listed a number of medications Mr. Pippin had been prescribed for pain and infection, including:  pregabalin (Lyrica),[2] chlorhexidine gluconate (Hibiclens) 4% liquid,[3] ciprofloxacin (Cipro) 500 mg

---

[2] Pregabalin, or Lyrica, as it is commonly known, is used to treat pain, particularly nerve pain.  *See* http://www.lyrica.com (last visited June 8, 2016).

[3] Chlorhexidine gluconate, or Hibiclens, as  it is commonly known, is both a skin cleanser and antiseptic used to help protect against skin infections.  *See* http://www.hibiclens.com (last visited June 8, 2016).

tablet,[4] and etodolac SR 24 hr (Iodine XL) 600 mg.[5]  *Id.* at p. 54.  In addition, Dr. Mertz ordered Mr. Pippin "to be off work for one month due to leg injury" following this April 10th visit.  *Id.* at p. 50.

Just prior to the April 10th consultation with Dr. Mertz, Rock-Tenn communicated with Mr. Pippin in a letter dated April 2, 2014, to confirm once again that his claim had been denied because the medical information he had provided to date was insufficient to substantiate a short-term disability.  The letter stated:  "We have tried to reach you and your health care provider by telephone/fax on several occasions but have not been successful in getting the information."  (Doc. 13-6, p. 1).  The letter further advised Mr. Pippin that he had a right to appeal the company's decision within 180 calendar days and, in the course of that appeals process, provide further documentation to support his claim, including medical records.

On April 18, 2014, Mr. Pippin filed an appeal of the initial denial of his claim, which was acknowledged by Rock-Tenn in a letter dated April 28, 2014.  (Doc. 13-9, p. 1).  The letter reminded Mr. Pippin:  "It is your responsibility to provide us with medical information that you believe will support your claim.  The Benefit Service Center does not request or pay for medical records during the appeal process."  *Id.*

It appears that Mr. Pippin then made efforts to supplement his medical file, as

---

[4]The drug ciprofloxacin, or Cipro, as it is commonly known, is used to treat bacterial infections. *See* Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/ciprofloxacin-oral-route/description/drg-20072288 (last visited June 8, 2016).

[5] Etodolac, known as Iodine XL, is a nonsteroidal anti-inflammatory drug used to treat mild to moderate pain. *See* Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/etodolac-oral-route/description/drg-20069756 (last visited June 8, 2016).

reflected in a fax received by Rock-Tenn on April 29, 2014, from Mercy Clinic Orthopedics, containing Dr. Mertz's Attending Physician's Statement of Work Capacity and Impairment—a fill-in-the-blank and check-the-box document prepared by Rock-Tenn for use by physicians, that requested certain medical data, including the doctor's diagnosis of the claimant's condition, the dates the claimant visited the doctor's office, the doctor's recommendations about the claimant's current ability to return to work, and the doctor's estimate on when the claimant could return to work.  (Doc. 13-10, p. 1).  In filling out this form, Dr. Mertz opined that due to Mr. Pippin's "hematoma," he should "stay home from work" as of April 10, 2014.[6]  *Id.*  In the blank where Dr. Mertz was asked to state his reason for "recommending disability leave," he only wrote:  "No prolonged standing or walking." *Id.*  He also noted under the "Patient's Complaints" section of the form that Mr. Pippin suffered from "leg pain, bruising and swelling from shin to toes." *Id.* at p. 2.  Dr. Mertz checked "Yes" in response to the question on the form that read, "Do you currently consider your patient to be totally impaired from working?"  *Id.*  Finally, Dr. Mertz noted that he "anticipate[d] significant clinical improvement in my patient's functional capacity by the following date: 5/19/14."

Dr. Garrett filled out the same Rock-Tenn-generated form that Dr. Mertz did—the Attending Physician's Statement of Work Capacity and Impairment.  On the form, dated May 22, 2014, after Mr. Pippin had already returned to work full-time, Dr. Garrett described Mr. Pippin's injury as "contusion lower leg—swelling—pain—heat" due to "hematoma" and "infection." (Doc. 13-19, p. 57).  Like Dr. Mertz, Dr. Garrett also checked the box on the

---

[6] Dr. Mertz also noted on the form that Mr. Pippin's primary care physician had previously ordered him to be "off work 3-7-14 to 4-9-14," the entire previous month.  *Id.*

form indicating that Mr. Pippin was "totally impaired from working." *Id.*[7]

Mr. Pippin reported to Dr. Mertz for a follow-up examination, as scheduled, approximately a month after his initial consultation.  Dr. Mertz's chart notes from that visit on May 13, 2014, acknowledge that Mr. Pippin was "basically almost asymptomatic," though he still had "a little bit of nodular feeling of the medial aspect of his right leg along the medial gastrocnemius muscle." *Id.* at p. 65.  The doctor noted that Mr. Pippin had been "off work doing home range of motion strengthening" and had at this point recovered to the point of being "neurovascularly intact" and with "good strength." *Id.*  Dr. Mertz wrote a note releasing Mr. Pippin to work without restrictions, beginning the very next day. *Id.* at p. 51.  As his doctor ordered, Mr. Pippin did indeed report to work at Rock-Tenn, full-time, the day after his appointment with Dr. Mertz, May 14, 2014.

On July 18, 2014, Rock-Tenn sent Mr. Pippin a letter informing him that review of his appeal would take longer than usual—an extra 45 days—in order to have a physician-consultant review the file.  (Doc. 13-12).  The physician-consultant hired by Rock-Tenn was Dr. Martin Mendelssohn, a board-certified orthopedic surgeon who conducted a peer-review of Mr. Pippin's paper file, but never physically examined Mr. Pippin.  *See* Doc. 13-13.  Dr. Mendelssohn noted in his report, dated July 24, 2014, that Mr. Pippin's job involved

---

[7]  The administrative record also contains another Rock-Tenn form filled in by Dr. Garrett, dated August 21, 2014.  (Doc. 13-19, p. 58).  This form was apparently designed to be used in evaluating FMLA claims, which the Court assumes involve a different standard of review than claims for disability benefits.  Nevertheless, the FMLA form also was considered by Rock-Tenn as part of its evaluation of Mr. Pippin's disability claim.  The form states Dr. Garrett's recommendation that Mr. Pippin take a leave of absence plus undergo treatment for his leg injury from approximately the date of the injury until around May 22, 2014.  The form also notes Dr. Garrett's view that Mr. Pippin's injury required him to miss work "continuously" and that his absence was "medically necessary." *Id.*

50% walking and 50% standing "with 0% sitting" and frequent lifting, carrying, pushing and pulling. *Id.* at p. 2.   He also credited Dr. Mertz's diagnosis of Mr. Pippin's right-leg hematoma and resulting staph infection and observed that Dr. Mertz believed Mr. Pippin had "enough pain to keep him off work for one month." *Id.*  Dr. Mendelssohn indicated in his report that he had spoken by telephone with Dr. Garrett's nurse, who relayed Dr. Garrett's recommendation that an orthopedic surgeon or wound care physician should be assigned by Rock-Tenn to review Mr. Pippin's claim, "since the claimant had a hematoma and cellulitis." *Id.* at p. 4.   Dr. Mendelssohn also reported that, according to Dr. Garrett's nurse, Dr. Garrett expressed "no opinion with respect to [Mr. Pippin's] work ability." *Id.*

Dr. Mendelssohn also spoke by telephone with Dr. Mertz, Mr. Pippin's orthopaedist, prior to writing his report.   According to Dr. Mendelssohn, Dr. Mertz confirmed "that the claimant had a cellulitis with hematoma in his leg and was unable to work"; however, Dr. Mendelssohn opined that Dr. Mertz "could not provide evidence of any functional or neurological deficits." *Id.*  It is clear from Dr. Mendelssohn's report that he did not dispute that Mr. Pippin actually suffered a hematoma on his right leg, or that the leg became infected and was treated with antibiotics. *Id.*  He acknowledged that Mr. Pippin did, in fact, suffer "bruising and swelling from shin to talus." *Id.* at p. 3.   He noted, however, that although Mr. Pippin's injury caused swelling, the paper file lacked "evidence of any *marked* swelling." *Id.* at p. 4 (emphasis added). Moreover, Dr. Mendelssohn observed in his report that though Mr. Pippin's doctors recommended that he not return to his regular duties at work, there was no specific mention in the file of him suffering from an "abnormal gait" or "need for ancillary aides for ambulation." *Id.*  Further, there was no evidence of "deep vein

thrombosis," or "lymphangitis or lymphadenopathy." *Id.* at p. 5.   Nor could Dr. Mendelssohn find evidence "of drainage, lymphangitis, cellulitis, adenopathy, quantified restricted motion of his knee or ankle, or motor weakness of lower extremity muscles that would constitute a functional impairment or that would require reasonable accommodations or restrictions." *Id.* at p. 6.  Dr. Mendelssohn therefore concluded that Mr. Pippin—despite his injury—could have performed his job, "which is a medium physical exertion level," throughout the entire two-month period he claimed for disability leave. *Id.*  In particular, Dr. Mendelssohn "disagree[d] with the total length of work incapacity suggested by Dr. Mertz" because he found there was "no evidence of any functional or neurological deficits when the claimant was seen [by Dr. Mertz] on 4/10/14," and "the findings do not support the need for a functional impairment or accommodations and restrictions from [Mr. Pippin's] regular occupation . . . ." *Id.*

Based solely on Dr. Mendelssohn's review of the file and his recommendations, Rock-Tenn prepared a document entitled "Denial Uphold Recommendation," dated August 19, 2014, which stated that Mr. Pippin's first appeal was denied.  (Doc. 13-14).  That decision was memorialized in an August 22, 2014, letter addressed to Mr. Pippin, which reproduced Dr. Mendelssohn's findings and conclusions from his report and explained Mr. Pippin's next level of appeal rights.  (Doc. 13-15).

On September 11, 2014, Mr. Pippin wrote a letter requesting a second appeal of the denial of his claim.  (Doc. 13-17).  That appeal was acknowledged by the company by letter dated September 16, 2014.  (Doc. 13-18).  Then, on September 22, 2014, Rock-Tenn commissioned a second review of Mr. Pippin's medical file.  *See* Doc 13-20.  An unnamed doctor employed by Medical Review Institute of America, Inc. ("MRIoA") performed the

9

second peer-review.  According to the record, this reviewer was board-certified by the American Osteopathic Board of Physicians, and he identified himself as having had "experience with wound care treatment."   *Id.* at p. 4.

The MRIoA reviewer began his report by listing all the documents in Mr. Pippin's claim file and then summarizing his treatment history.  He observed that Mr. Pippin injured his right leg and thereafter suffered a hematoma and cellulitis, which his doctors indicated produced "enough pain to keep him off work."   *Id.* at p. 2.  The reviewer then suggested two "Questions for Review" that would help him determine whether to approve or deny the claim.  The first question was:  "Was Charles Pippin able to work 3/10/14 through 5/14/14?" *Id.* at p. 3.  To this he responded, "Yes," noting that although Mr. Pippin had suffered an injury, he did not qualify for short-term disability for the following reasons:

> While there are notes in the records indicating the patient was advised to stay off work, the office notes document no functional deficits, motor weakness, sensory loss, or physical exam findings that would support the need to be out at work.  Based on the records sent for review, the patient could have worked during the dates in question.

*Id.*[8]

The MRIoA reviewer's second question was:  "Was [Mr. Pippin] able to work any of this time [from March 10 to May 14, 2014]?"   *Id.*  Without analysis or explanation, the reviewer simply answered:  "The patient could have worked during all of the dates in question."   *Id.*

After the second peer-review was completed, Rock-Tenn denied Mr. Pippin's second appeal on November 25, 2014.  (Doc. 13-21).  Mr. Pippin timely filed the instant

---

[8] The MRIoA reviewer's reasons for denying Mr. Pippin's claim are substantively identical to Dr. Mendelssohn's and offer no further analysis or explanation.

lawsuit in this Court, after having exhausted his administrative appeal rights.

## II.  LEGAL STANDARD

Generally, once a plaintiff has exhausted his administrative remedies, the court's function is to conduct a review of the record that was before the administrator of the plan when the claim was denied.  *Farfalla v. Mutual of Omaha Ins. Co.*, 324 F.3d 971, 974-75 (8th Cir. 2003); *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  A denial of benefits claim under ERISA is reviewed for an abuse of discretion when "a plan gives the administrator discretionary power to construe uncertain terms or to make eligibility determinations."  *King v. Hartford Life & Accident Ins. Co.*, 414 F.3d 994, 998-99 (8th Cir. 1997) (en banc) (citing *Firestone*, 489 U.S. at 111).  When a plan confers discretionary authority, then the Court must defer to the determination made by the administrator or fiduciary unless such determination is arbitrary and capricious. *Firestone*, 489 U.S. at 115. "[R]eview for an 'abuse of discretion' or for being 'arbitrary and capricious' is a distinction without a difference" because the terms are generally interchangeable. *Jackson v. Prudential Ins. Co. of Am.*, 530 F.3d 696, 701 (8th Cir. 2008) (citing *Schatz v. Mutual of Omaha Ins. Co.*, 220 F.3d 944, 946 n.4 (8th Cir. 2000)).

The Court finds that in the case at bar, abuse of discretion is the proper standard of review because the disability benefits plan (the "Plan") applicable to Mr. Pippin's claim confers "complete discretionary authority" upon Rock-Tenn, as Plan administrator, "to construe the terms of [the] Plan, to determine a person's status, coverage, and eligibility for benefits, and to resolve all administrative, interpretative, operational, equitable and other questions that shall arise in the operation and administration of [the] Plan . . . ." (Doc.

16-2, p. 11). All that being said, however, the Court finds that it must apply closer scrutiny than usual in this particular case because a structural conflict of interest exists: Rock-Tenn admits that the Plan is self-insured, and Rock-Tenn is therefore both Plan administrator *and* payer of benefits. (Doc. 16-1, p. 4). *See Atkins v. Prudential Ins. Co.*, 404 F. App'x 82, 86 (8th Cir. 2010) (structural conflict of interest is factor for the court to consider on review of ERISA-based claim when the same party is both claims administrator and insurer). The importance of this factor will vary depending on whether circumstances suggest a high or low likelihood that the conflict of interest affected the benefits decision. *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008).

In general, the decision of a plan administrator may only be overturned if it is not "reasonable, i.e., supported by substantial evidence." *Donaho v. FMC Corp.*, 74 F.3d 894, 899 (8th Cir. 1996). An administrator's decision should be deemed reasonable by the reviewing court if "a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person *would* have reached that decision." *Id.* If a decision is supported by a reasonable explanation, then it should not be disturbed, even though a different reasonable interpretation could have been made. *Cash v. Wal-Mart Group Health Plan*, 107 F.3d 637, 641 (8th Cir. 1997) (citing *Donaho*, 74 F.3d at 899). Nonetheless, although it is "not unreasonable for a plan administrator to deny benefits based upon a lack of objective evidence," that denial must still be supported by substantial evidence in order to withstand judicial scrutiny. *McGee v. Reliance Standard Life Ins. Co.*, 360 F.3d 921, 924-25 (8th Cir. 2004).

In addition to the potential conflict of interest mentioned previously, there are five

key factors the Court will consider to determine whether Rock-Tenn's decision was reasonable:

> (1)   whether the administrator's interpretation is consistent with the goals of the Plan;
>
> (2)   whether the interpretation renders any language in the Plan meaningless or internally inconsistent;
>
> (3)   whether the administrator's interpretation conflicts with the substantive or procedural requirements of the ERISA statute;
>
> (4)   whether the administrator interpreted the relevant terms consistently; and
>
> (5)   whether the interpretation is contrary to the clear language of the Plan.

*Torres v. Unum Life Ins. Co. of Am.*, 405 F.3d 670, 680 (8th Cir. 2005) (citing *Shelton v. ContiGroup Cos., Inc.*, 285 F.3d 640, 643 (8th Cir. 2002)).

## III.  DISCUSSION

The Rock-Tenn Plan promises to pay benefits to employees who "become Totally Disabled, due to Sickness or Injury, while covered under the Plan . . . ." (Doc. 16-1, p. 22). The company will consider a claimant to be suffering from a "Total Disability" when he:

> 1.   [is] unable to perform the duties of [his] occupation on a full-time or part-time basis because of an illness or injury that started while covered under this Plan and [is] receiving treatment which [his] Physician certifies to impair [his] ability to function safely within the work environment and poses significant risk to [him]self and/or others;
>
> 2.   do[es] not work at all in any occupation; and
>
> 3.   [is] under the appropriate treatment and care of a Physician who has documented that the employee is totally disabled and cannot work.

*Id.* at p. 23.

The Plan does not specify what sort of documentation the claimant's physician must

13

provide in order to sufficiently prove to Rock-Tenn's satisfaction that the claimant is disabled; instead, the Plan states generally that the claimant and his physician must "provide proof" of both total disability and the claimant's appropriate treatment and care by a physician. *Id.* In reviewing the proof provided by Mr. Pippin, the Court finds that Rock-Tenn's decision to deny him short-term disability benefits for the entire period from March 10 to May 14, 2014, was an abuse of discretion.

It bears mentioning that during the initial stages of the claim-review process until the end of March of 2014, the only documentation in Mr. Pippin's file consisted of letters from treating doctors and nurses describing Mr. Pippin's injury and instructing his employer to "please excuse him" from work. Those notes might have been sufficient to establish Mr. Pippin's entitlement to unpaid FLSA leave, but Rock-Tenn deemed them insufficient to establish a short-term disability. Rock-Tenn initially denied Mr. Pippin's disability claim on March 24, 2014, but specifically requested in writing that Mr. Pippin provide more documentation of his condition, leaving open the possibility that the claim would be reviewed again.

The Court also notes that, as of March 24th, the date Rock-Tenn made its initial denial determination, Mr. Pippin had only missed two weeks of work—under doctors' orders. Rock-Tenn appropriately continued the "dialogue" between its reviewers and Mr. Pippin, as required by ERISA, and permitted him to provide throughout the coming weeks further medical support for his claim. See *Abram v. Cargill, Inc.*, 395 F.3d 882, 886 (8th Cir. 2005) ("ERISA and its accompanying regulations essentially call for a meaningful dialogue between the plan administrators and their beneficiaries." (internal quotation and citation omitted)) (superseded by regulation on other grounds as recognized in *Midgett v.*

14

*Wash. Group Int'l Long Term Disability Plan*, 561 F.3d 887 (8th Cir. 2009)).

Rock-Tenn's second denial of Mr. Pippin's claim was not made until August 19, 2014, based entirely on a July 24, 2014 report authored by Dr. Mendelssohn, a physician hired by Rock-Tenn to review the medical data.[9]  At that point in the review process, Mr. Pippin's file had been supplemented with several more reports submitted by both Drs. Garrett and Mertz, and Dr. Mendelssohn acknowledged reviewing all of these reports prior to making his recommendation.  In particular, Dr. Mendelssohn acknowledged in his report that at the time of his injury, Mr. Pippin was a 66-year old man with a physically demanding, all-ambulatory job consisting of maintenance work in a factory setting.  Dr. Mendelssohn did not dispute the medical records detailing Mr. Pippin's history of a right-leg impact injury that left him with a contusion and hematoma extending from his shin to his toes.  He also agreed that Mr. Pippin reported to work as usual, immediately after he was injured, and for the next ten days, until he developed an infection and abscess at the site of the wound.  Finally, his report notes that those who treated Mr. Pippin's wound ordered him to stay home from work because he was not to engage in prolonged standing and walking due to swelling, pain, and infection.

Despite the above factual findings, Dr. Mendelssohn concluded that Mr. Pippin

---

[9]  The Court observes that Dr. Mendelssohn's findings and recommendations were adopted in toto by Rock-Tenn in substantively denying Mr. Pippin's claim; therefore, the Court considers Rock-Tenn's reasoning for denying Mr. Pippin's claim to be the same as Dr. Mendelssohn's reasoning for recommending the denial.  *See* Doc. 13-15 (letter from Rock-Tenn to Mr. Pippin denying his initial appeal and incorporating language verbatim from Dr. Mendelssohn's report to justify the decision).  Further, the MRIoA doctor who performed Mr. Pippin's next level of appellate review made no new findings or recommendations as compared to Dr. Mendelssohn's.  Indeed, the MRIoA doctor appears to have agreed with all of Dr. Mendelssohn's conclusions and essentially reproduced them in his own brief report.

should not receive short-term disability benefits.  The Court finds that this decision was not based on substantial evidence.  First, Dr. Mendelssohn's conclusion required him to ignore the medical evidence provided by Mr. Pippin's treating physicians, even though Dr. Mendelssohn never questioned these doctors' judgment or credibility, particularly with respect to their diagnosis and recommended treatment plan for Mr. Pippin.  Second, Dr. Mendelssohn failed to consider in his report Mr. Pippin's age and how that might have impacted his ability to heal from his injury, including the length of time his doctors determined that he needed to remain off work in order to heal.  Third, the report failed to explain how Mr. Pippin could have reasonably returned to his job during the claims period, when that job required normal mobility and balance, as well as prolonged standing and walking—capabilities Dr. Mendelssohn could only speculate that Mr. Pippin possessed during the claims period, contrary to all of his doctors' observations and recommendations.  Fourth, Dr. Mendelssohn's report failed to discuss the implications of Mr. Pippin's having being prescribed a combination of four different medications for pain and infection as of the date of his visit with Dr. Mertz, *six weeks after the date of the injury*, a fact that tended to support his claim for disability.[10]

Dr. Mendelssohn's recommended denial of disability benefits flowed from his observation that Mr. Pippin "could not provide evidence of any functional or neurological deficits" during the claim period.  *Id.*  On the contrary, the Court observes that Mr. Pippin submitted evidence of various deficits he suffered, including bruising, swelling, pain, and

---

[10] The medical record indicates that the infection was still present as of April 10, 2014.  Dr. Mertz's notes from that date indicate that the wound still exhibited "[m]inimal warmth," though "no obvious sepsis," and the "updated medication list" he prescribed included drugs to combat both pain *and infection*.  *See* Doc. 13-19, p. 54.

infection at the site of his leg wound.  These symptoms resulted in a defined functional deficit: his inability to stand or walk for prolonged periods.  As for whether the supporting evidence showed any neurological deficits, *Stedman's Medical Dictionary* (28th ed. 2006) defines "neurology" as "[t]he branch of medical science concerned with the various nervous systems (central, peripheral, and autonomic), plus the neuromuscular junction and muscle, and their disorders."  The Court is uncertain whether Mr. Pippin's pain symptoms were neurological in nature or not, judging by this definition.  But in any event, Dr. Mendelssohn's reliance on the lack of neurological evidence was never explained, nor did he attempt to clarify why that type of evidence was needed to establish a claim for benefits, if not the evidence provided by Mr. Pippin's doctors.  According to the Plan, only the following three criteria are needed to support a claim for benefits:  (1) certification by a physician that the employee is unable to safely, and without risk to himself and others, perform the duties of the employee's occupation on a full-time or part-time basis, given the particular work environment; (2) proof that the employee is not working in any occupation during the claim period; and (3) a written opinion by the employee's treating physician that the employee cannot work due to total disability.  *See* Doc. 16-1, p. 23.

In his report, Dr. Mendelssohn acknowledged that Mr. Pippin's treating physicians forbade him from returning to his job, and did so because they believed his injury rendered him unable to engage in prolonged standing or walking at work.  It appears to the Court that, instead of focusing on what Mr. Pippin's doctors *did write* regarding his condition, Dr. Mendelssohn chose to focus on what the doctors *did not write*—but that Dr. Mendelssohn felt was important.  For example, Dr. Mendelssohn was apparently struck by the fact that neither Dr. Garrett nor Dr. Mertz affirmatively stated that Mr. Pippin had an "abnormal gait"

17

or evaluated whether he had a "need for ancillary aides for ambulation."  (Doc. 13-13, p. 4).  Dr. Mendelssohn was also bothered by the fact that Drs. Garrett and Mertz neglected to make a "quantified" finding as to whether Mr. Pippin had "restricted motion of his knee or ankle, or motor weakness of his lower extremity muscles."  *Id.* at p. 5.  Importantly, Dr. Mendelssohn never explained in his report why such omissions were material to the disability determination, in light of the doctors' other findings.

The law is clear that ERISA plan administrators are not required "automatically to accord special weight to the opinions of a claimant's physician," but neither may they "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). Here, the Court concludes that Dr. Mendelssohn arbitrarily refused to credit Mr. Pippin's doctors' opinions regarding his ability to work full-time.  It follows, therefore, that Rock-Tenn may not rely upon Dr. Mendelssohn's unsupported opinion when determining Mr. Pippin's eligibility for benefits.  *See Willcox v. Liberty Life Assur. Co. of Boston*, 552 F.3d 693, 700-701 (8th Cir. 2009) (citing *Abram*, 395 F.3d at 887 (finding that a plan administrator is not free to accept a peer reviewer's report "without considering whether its conclusions follow logically from the underlying medical evidence")); *Torres*, 405 F.3d 670, 680 (8th Cir. 2005)  (reasonableness of plan administrator's decision can be assessed by both quantity and quality of supporting evidence).

The Court now turns to the five factors that must be considered in determining whether a plan administrator's decision should be upheld or overturned.  *See Shelton*, 285 F.3d at 643. The first factor is whether the decision was consistent with the goals of the

Plan.  The Court finds it was not.  The stated goal of Rock-Tenn's Plan is to "approve[] payment of a benefit . . . only when you and your Physician provide proof that you are Totally Disabled."  (Doc. 16-1, p. 23).  As explained previously, proof of "Total Disability" requires a claimant to submit proof from his physician that he is or was being treated for an illness or injury, that the injury "impair[ed] [his] ability to function safely within the work environment," that the employee was not working "at all in any occupation" during the claim period, and that the physician "documented that the employee [was] totally disabled and [could] not work."  *Id.*

All of the above criteria were met in Mr. Pippin's case, yet his claim was denied pursuant to Dr. Mendelssohn's recommendation, which was adopted by Rock-Tenn and later ratified again after a second paid medical reviewer endorsed Dr. Mendelssohn's conclusions.  The fact is that the only evidence in the medical record supported Mr. Pippin's claim that he was unable to work, either on a part-time or full-time basis, for a two-month period, after considering the physical demands of his job.  *Cf. Torres*, 405 F.3d at 681 (finding that when the only medical evidence in the record supports the employee's claim that he was unable to perform at his job, the failure to credit this evidence is an abuse of discretion).

The second factor is whether Rock-Tenn's interpretation of the Plan rendered any language in the Plan meaningless or internally inconsistent.  *Shelton*, 285 F.3d at 643.  Here again, Rock-Tenn's total reliance on Dr. Mendelssohn's determination that Mr. Pippin did not meet the criteria for short-term disability, due to a lack of "evidence of any functional or neurological deficits," rendered meaningless the language of the Plan defining "Total Disability."

The third factor is whether Rock-Tenn's interpretation of its Plan conflicts with the substantive or procedural requirements of the ERISA statute.  This factor also weighs in Mr. Pippin's favor because "ERISA requires all plan fiduciaries—a term that includes plan administrators—to discharge their duties in accordance with the plan documents."  *Torres*, 405 F.3d at 681 (citing 29 U.S.C. § 1104(a)(1)(D)).  Rock-Tenn failed to discharge its duty to assess Mr. Pippin's eligibility for short-term disability benefits when it ignored evidence from his treating physicians that was directly related to the Plan's definition of "Total Disability."

The fourth and fifth factors—whether Rock-Tenn interpreted the relevant terms of the Plan consistently and whether its interpretation was contrary to the clear language of the Plan—weigh in favor of Mr. Pippin, as well.  As explained above, Dr. Mendelssohn failed to cite to and rely on any affirmative medical proof to support his conclusion that Mr. Pippin's doctors were wrong and Mr. Pippin was, in fact, capable of working at his job during the claim period.  Rock-Tenn's denial of Mr. Pippin's claim was therefore contrary to the clear language of the Plan.

While Mr. Pippin's doctors did not provide an overwhelming level of detail and support for their findings and recommendations, their opinions were consistent with a finding of short-term disability, especially considering the nature of Mr. Pippin's injury.  Dr. Mendelssohn, on the other hand, provided no support for his opinion that Mr. Pippin could have returned to work, other than his own speculation.  He never stated that he believed Mr. Pippin had been malingering, or feigning his complaints of pain.  He never attacked the treating doctors' credibility or direct observations of Mr. Pippin's condition.  He relied on no evidence in the record to suggest that Mr. Pippin *was not disabled* or *was able to work* in

any capacity at his job from March 10 to May 14, 2014.  Further, the Court finds that certain symptoms such as pain, swelling, or difficulty in healing are inherently challenging to quantify with objective testing and, in some cases, may only be observed and reported. For these reasons, it appears to the Court that Rock-Tenn merely rubber-stamped Dr. Mendelssohn's review without examining critically whether the record supported his findings and whether his rationale for denying the claim entirely was adequately explained.

The final factor the Court must consider is whether the structural conflict of interest that existed here, due to Rock-Tenn's dual role as both evaluator and payer of claims, manifested itself in the claim review process as an actual conflict of interest.  The Supreme Court has held that the conflict of interest should prove less important to a reviewing court "when the administrator has taken active steps to reduce potential bias and to promote accuracy." *Glenn*, 554 U.S. at 117.  Here, it appears Rock-Tenn hired two doctors to perform peer reviews of the medical record, which was a positive attempt to create objectivity in the review process as a whole.  That being said, it is concerning that Rock-Tenn apparently never questioned Dr. Mendelssohn's conclusion that Mr. Pippin should be denied disability benefits, especially when Dr. Mendelssohn only did so by disregarding the treating physicians' opinions and substituting them with his own speculation.  In addition, Rock-Tenn failed to question the report of the second reviewer from the MRIoA, even though the report was cursory, at best, and only parroted Dr. Mendelssohn's conclusions.

The Court is not aware of Rock-Tenn's having a history of biased claims administration; however, Rock-Tenn's review of Mr. Pippin's individual claim, and all its surrounding circumstances, indicates that the review process was not well-scrutinized and

21

tends to support a conclusion that a true conflict of interest existed.  This factor, like all the others, weighs in Mr. Pippin's favor and mandates a reversal of Rock-Tenn's decision.

## IV. CONCLUSION

**IT IS ORDERED** that Defendant Rock-Tenn Company Group Benefit Plan's denial of Plaintiff Charles Pippin's claim for short-term disability benefits is **REVERSED**, and the claim is **ORDERED** to be paid in full.

**IT IS FURTHER ORDERED** that, should Plaintiff's counsel request fees and costs for his work in this matter, an appropriate motion should be filed no later than 14 days following the date of this Order.  The Court will withhold final entry of Judgment until the issue of Plaintiff's counsel's attorney fees and costs is resolved.

**IT IS SO ORDERED** on this 20th day of June, 2016.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE